**Catherine S. BISHOP, Plaintiff,**

v.

**The OFFICE OF CIVILIAN HEALTH AND MEDICAL PROGRAMS OF the UNIFORMED SERVICES, (CHAMPUS), a subdivision of the Department of Defense of the United States of America, and William Perry, in his official capacity as the Secretary of Defense for the United States, Defendants.**

No. CS–96–0045–AAM.

United States District Court,
E.D. Washington.

March 5, 1996.

---

William F. Etter and David J. Groesbeck of Etter, McMahon & Lamberson, Spokane, Washington, for plaintiff.

Assistant United States Attorney William Beatty, Spokane, Washington, for defendants.

## ORDER GRANTING PERMANENT INJUNCTION AND DECLARATORY RELIEF

McDONALD, District Judge.

Before the Court is plaintiff's claim for permanent injunction and declaratory relief. Plaintiff was represented by William Etter and David Groesbeck of Etter, McMahon & Lamberson, Spokane, Washington. Defendant was represented by Assistant United States Attorney William Beatty, Spokane, Washington. Upon consideration of the record, the Court enters the following order.

### I. BACKGROUND

*A. Parties*

Catherine Bishop is a 57–year–old woman with Stage IV metastatic breast cancer. Bishop's husband, Henry, is retired from the Air Force. As former military personnel, Henry Bishop maintains medical coverage for himself and his family with the Office of Civilian Health and Medical Programs of the Uniformed Services (CHAMPUS), a subdivision of the United States Department of Defense.

CHAMPUS is a health benefits program established by Congress. 10 U.S.C. § 1071, et. seq. CHAMPUS is not identical to an insurance company, although it provides health care coverage. *See* 32 C.F.R. § 199.1(d); *Wilson v. CHAMPUS*, 65 F.3d 361, 363 (4th Cir.1995). Beneficiaries do not pay insurance premiums; rather, Congress annually appropriates funds to CHAMPUS. 32 C.F.R. § 199.1(e). Beneficiaries must make co-payments as specified by Congress. *See* 10 U.S.C. §§ 1079(b), (c), (e), 1086(b).

Recently, the Secretary of the Department of Defense implemented the TRICARE program. *See* 32 C.F.R. § 199.17; 60 Fed.Reg. 52078, 52095. This program establishes and implements comprehensive managed health care programs for CHAMPUS beneficiaries

through managed care support contracts. 32 C.F.R. § 199.17(a)(1); 60 Fed.Reg. at 52095. Foundation Health Federal Services (Foundation) is the managed care contractor for CHAMPUS in the Pacific Northwest TRICARE region. Affidavit of David Bogner, M.D., Medical Director of CHAMPUS, at 1.

### B.  Facts and Procedural History

Bishop was initially diagnosed with breast cancer in 1984. Treatment was successful and she remained healthy until 1994. Bishop's condition quickly deteriorated, and in June 1995, she was diagnosed with Stage IV high-risk metastatic breast cancer. Bishop's treating physician, Dr. Andrew Hertler, recommended an aggressive treatment known as high-dose chemotherapy (HDC) with peripheral stem cell rescue (PSCR).

HDC treatment involves the administration of dose-intensive chemotherapy, considered more effective in killing cancerous cells than conventional chemotherapy. Necessarily, the higher doses of chemotherapeutic agents also kill healthy white blood cells. Two support therapies that accompany HDC protect the patient from otherwise lethal effects of HDC. In PSCR, healthy stem cells are harvested from the patient's bloodstream. Similarly, an autologous bone marrow transplant (ABMT) harvests stem cells from the patient's bone marrow. In both therapies, the cells are stored and reinfused into the patient's blood after receiving HDC.[1] HDC with PSCR is the treatment at issue in this case.

HDC/PSCR treatment is comprised of several stages. First, the patient is given low doses of chemotherapeutic agents, followed by moderate doses of standard chemotherapeutic agents. During the second stage of treatment, the patient's system produces surplus blood components known as stem cells. The surplus stem cells are removed immediately following the second stage and frozen for storage.

In the next stage, the patient receives high doses of chemotherapeutic agents. This stage of treatment kills the cancerous cells, as well as healthy white blood stem cells. After the third stage of treatment, the previously collected stem cells are thawed and reinjected into the bloodstream to rebuild the depleted stem cell count. Extended hospitalization is almost certain.

Prior to filing suit, Bishop had undergone two stages of treatment. It was necessary for Bishop to proceed with HDC/PSCR on or about February 3, 1996. According to Dr. Hertler, a patient has a "narrow window of time" in which the surplus stem cells can be collected. After that time passes, no further opportunities exist to collect the cells and administer the high doses of chemotherapy. Declaration of Andrew A. Hertler at 6. Dr. Hertler asserts that HDC/PSCR is Bishop's best chance for long-term survival. Without this treatment, Dr. Hertler believes that Bishop could very likely die. Id. at 4.

The clinic in which Bishop is scheduled to undergo HDC/PSCR therapy requires preauthorization of insurance benefits before the treatment may proceed. If a patient does not have insurance, the clinic requires prepayment or execution of "an agreement sufficient to guarantee payment." Affidavit of William Poppy at 2. Apparently, the treatment costs between $60,000 and $100,000. Affidavit of Catherine (Kay) Bishop at 2. Bishop claims that she and her husband cannot obtain the amount necessary for the treatment. Id. at 3.

Bishop requested a pre-treatment coverage commitment from CHAMPUS. Foundation, as the TRICARE contractor for CHAMPUS, denied Bishop's claim, stating that HDC/PSCR was not "appropriate or effective" under the terms of its plan. Bishop requested an expedited review of that decision from CHAMPUS. Bishop submit-

---

1. PSCR and ABMT are support treatments for high-dose chemotherapy. Neither are the principle components of HDC treatment.

Even though PSCR and ABMT are different procedures, CHAMPUS equates the two because the treatments "share the same resources and the same goals." Affidavit of Dr. Bogner at 2.

The Court questions whether the CHAMPUS policy of equating PSCR and ABMT would survive judicial review, even under the deferential standard imposed by the APA. However, this issue is irrelevant as the Court finds both PSCR and ABMT "generally accepted" treatments and therefore covered under CHAMPUS policy.

ted evidence in support of her claim, but CHAMPUS did not respond.

On January 19, 1996, Bishop filed suit against CHAMPUS, requesting preliminary and permanent injunctions enjoining CHAMPUS from denying coverage for HDC/PSCR treatment, in addition to a declaratory judgment that CHAMPUS covers HDC/PSCR treatment.[2] Bishop also seeks attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412. Upon hearing with oral argument, the court granted Bishop's motion for preliminary injunction on January 26, 1996. During oral argument, counsel for both parties agreed that judicial review of CHAMPUS' denial of coverage was limited to the administrative record. The parties requested that the Court determine the merits of Bishop's claim without further briefing or motion from either party.

The Court construes the parties' requests as cross-motions for summary judgment based on the record and filings presently before the Court. Although neither party officially moved for summary judgment or submitted an LR 56 statement of facts, no issue of material fact is contested; the issue is solely a question of law. Thus, the Court will proceed under summary judgment analysis.

## II. JOINDER

■ An initial question arises as to whether the necessary parties are before the Court. Bishop alleges that CHAMPUS unlawfully denied medical coverage for HDC/PSCR; however, CHAMPUS did not initially deny coverage for the treatment. Rather, Foundation, as a managed care contractor for CHAMPUS, made the decision to deny CHAMPUS benefits. Affidavit of Dr. Bogner at 1. During oral argument on the motion for preliminary injunction, counsel for

CHAMPUS expressed concern that Foundation was not named as a defendant.

A party must be joined in an action if "in the [party]'s absence complete relief cannot be accorded among those already present." Fed.R.Civ.P. 19(a)(1).[3] Therefore, the question is whether Bishop can obtain complete relief from CHAMPUS alone.

Under regulations governing CHAMPUS policy and procedures, a fiscal intermediary has authority to deny or approve benefits on behalf of CHAMPUS. 32 C.F.R. § 199.4(a)(3). A fiscal intermediary is defined as an "organization with which the Director, OCHAMPUS [Office of CHAMPUS] has entered into a contract for the adjudication and processing of CHAMPUS claims and the performance of related support activities." 32 C.F.R. § 199.2. Foundation is a "Managed Care Contractor authorized by CHAMPUS to review transplant and transplant related services." Letter from Jack Dutzar, M.D., Vice President of Medical Affairs, dated December 6, 1996. Dr. Bogner confirms that Foundation is the care contractor for CHAMPUS in the Northwest TRICARE region. Affidavit of Dr. Bogner at 1. As such, Foundation implements CHAMPUS policy directives.

As stated at oral argument, Foundation's denial of coverage for Bishop's treatment is based on CHAMPUS policy. Moreover, Dr. Bogner, medical director of CHAMPUS, asserts that Foundation's determination was consistent with CHAMPUS policy. Affidavit of Dr. Bogner at 1. No evidence suggests that Foundation exercises independent decision-making authority regarding CHAMPUS medical coverage. Eligibility and coverage policies are defined by CHAMPUS. Foundation, as a fiscal intermediary, simply determines Bishop's eligibility for benefits on behalf of CHAMPUS. If the Court finds that

---

2. Bishop also claimed that CHAMPUS violated the Equal Protection Clause of the United States Constitution by denying benefits for breast cancer treatment. However, neither party argued or briefed this issue. Accordingly, the Court considers this claim withdrawn.

3. Joinder is also required if the unjoined party claims an interest relating to the subject of the action and is so situated that the disposition of

the action in the [party]'s absence may (i) as a practical matter impair or impede the [party]'s ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
Rule 19(a)(1), (2). The Court is not aware of any claimed interest by Foundation.

Bishop is entitled to CHAMPUS benefits, Foundation must provide coverage for Bishop's treatment. Accordingly, joinder of Foundation is not required.

## III. STANDARD FOR SUMMARY JUDGMENT

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner*, 780 F.2d 727 (9th Cir.1985).

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

Neither party disputes the underlying facts. Accordingly, summary judgment is appropriate.

## IV. PERMANENT INJUNCTION AND DECLARATORY RELIEF

Foundation's denial of coverage was based on a finding that HDC/PSCR was not "appropriate" or "effective" treatment for breast cancer. Further, CHAMPUS asserts that HDC/PSCR is "experimental" and "investigative," and therefore excluded from coverage under CHAMPUS policy. Bishop challenges CHAMPUS' findings and argues the denial of HDC/PSCR treatment is "arbitrary and capricious" under the Administrative Procedure Act (APA), 5 U.S.C. § 706.

### A. Standard of Review

The APA provides several standards for judicial review of agency actions. For final non-adjudicatory actions, a court must determine whether the action was "arbitrary, capricious, ... or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Adjudicatory actions or actions reviewed "on the record of an agency hearing provided by statute" are subject to the "substantial evidence" standard of review. 5 U.S.C. § 706(2)(E). CHAMPUS' denial of benefits did not involve a hearing "on the record" or adjudicatory action. Accordingly, the arbitrary and capricious standard is the appropriate standard of review.

Under this standard, a court must consider whether the action was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The scope of review is narrow, and a court cannot substitute its judgment for the agency's. *Id.* However, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)).

CHAMPUS claims its denial of coverage for HDC/PSCR is consistent with government regulations and CHAMPUS policy. According to regulatory provisions, CHAMPUS must provide "medically necessary services and supplies required in the diagnosis and treatment of illness and injury." C.F.R. § 199.4(a)(1). CHAMPUS may exclude from coverage those procedures "[n]ot in accordance with accepted standards, experimental, or investigational." *Id.* § 199.4(g)(15). The regulations further define "experimental" as "[m]edical care that essentially is an investigatory or an unproven procedure or treatment regimen (usually performed under controlled medicolegal conditions) that does not

meet the *generally accepted standards of usual professional medical practice in the general community.*" *Id.* § 199.2(b) (emphasis added).

The CHAMPUS policy manual lists procedures deemed experimental or investigative. *CHAMPUS Policy Manual,* § 14.1. HDC/PSCR is not included in the list of investigative or experimental treatments, however, the policy subsequently states that CHAMPUS considers HDC with PSCR or ABMT experimental for breast cancer. *Id.* at 14.1.7.[4] Unless this classification of HDC/PSCR is arbitrary or capricious, the Court must uphold CHAMPUS' denial of benefits for Bishop's treatment.

**B. Analysis**

■ CHAMPUS claims that a "lack of refereed medical literature that would support CHAMPUS coverage of [HDC/PSCR] for the treatment of breast carcinoma" renders HDC/PSCR experimental and investigative. Affidavit of Dr. Bogner at 3. CHAMPUS utilizes the following hierarchy of sources in assessing whether treatments are generally accepted: 1) congressional direction; 2) outcome-based, Phase III trials published in peer-reviewed refereed medical literature;[5] and 3) formal technology assessments. *Id.* at 6.

Further, CHAMPUS cites three technology assessments as support for its classification of HDC/PSCR: a 1990 American Medical Association Diagnostic and Therapeutic Technology Assessment (DATTA) evaluation of autologous bone marrow transplantation (DATTA report); a 1988 study on autologous bone marrow transplants prepared by the Office of Health Technology Assessment (OHTA report); and a February 1995 study on HDC/ABMT and PSCR for the treatment of breast cancer prepared by ECRI, a non-profit organization chartered by the Com-monwealth of Pennsylvania (ECRI report). Affidavit of Dr. Bogner at 3. CHAMPUS argues that these reports, along with the lack of refereed Phase III clinical trials, justifies its exclusion of HDC/PSCR for the treatment of breast cancer. The Court discusses these sources in turn.

**1. Congressional Direction**

■ According to Dr. David Bogner, Medical Director of CHAMPUS, CHAMPUS considers a therapy generally accepted if it is "safe, effective, and superior" when compared to conventional treatments. Affidavit of Dr. Bogner at 5. Further, Dr. Bogner asserts that under an "internal process for the evaluation of emerging medical technologies ... the best evidence of the safety, efficacy and superiority to existing therapies is Phase III refereed medical literature." *Id.* However, the applicable regulations require only that the treatment be "generally accepted" within the medical community, "not that it prospectively be proven to have a statistically significant effect in curing a disease." *Wilson v. CHAMPUS,* 65 F.3d 361, 366 (4th Cir.1995). CHAMPUS' internal procedure used to assess the general acceptance of a treatment has no basis in the governing regulations.

Moreover, as stated by Dr. Hertler, this treatment is generally accepted in the State of Washington and nationwide. Dr. Hertler asserts that HDC/PSCR has been proven effective in treating women with Stage IV metastatic breast cancer. Affidavit of Dr. Hertler at 5. Dr. Hertler notes that this treatment is generally accepted at cancer centers nationwide, including the University of Washington, the Fred Hutchinson Cancer Center in Seattle, and Sacred Heart Medical Center in Spokane. *Id.* at 6. Exhibits submitted to CHAMPUS for review also reflect the widespread acceptance of this treatment

---

4. CHAMPUS approves HDC/ABMT or PSCR for various other malignancies, including: non-Hodgkin's lymphoma; Stage III or IV neuroblastoma; acute lymphocytic or nonlymphocytic leukemias; primitive neuroectodermal tumors; gliofibromas; glioblastoma multiforme; and posterior fossa teratoid brain tumors. CHAMPUS Policy Manual, § 6.38230.1 at 38230.1.2.

5. Clinical testing of particular treatments occurs in three phases. In Phase I trials, therapies are usually administered to humans for the first time. In Phase II studies, the efficacy of the treatment against cancer is determined. Therapies shown to be effective in treating cancer then proceeds to Phase III trials, in which the therapy is directly compared with conventional treatments. Affidavit of Dr. Bogner, at 6–7.

by oncologists and cancer treatment centers. *See* Administrative Record, Exhibit 1.

### 2. Phase III Clinical Trial

Even if interpretation of the regulations supported an "internal process" equating a treatment's general acceptance with proof of its superiority through Phase III trials, CHAMPUS' denial of benefits for HDC/PSCR is arbitrary and capricious under this standard.

Dr. Bogner claims that CHAMPUS "has continually monitored the development of the literature and the status of ongoing Phase III trials." Affidavit of Dr. Bogner at 3. Dr. Bogner further states that "[t]o date there has been no new evidence which would warrant a departure from the original coverage determination to exclude CHAMPUS cost-sharing of this procedure as investigational for the treatment of breast carcinoma." *Id.*

Contrary to Dr. Bogner's assertions, a recently published study confirms the efficacy of HDC/PSCR or ABMT in breast cancer patients when compared with conventional chemotherapy. *See* W.R. Bezwoda, L. Seymour, & R.D. Dansey, *High Dose Chemotherapy With Hematopoietic Rescue as Primary Treatment for Metastatic Breast Cancer: A Randomized Trial*, 13 J. Clinical Oncology 2483 (October 1995) (Bezwoda Report). This report is a Phase–III clinical trial published in a peer-reviewed refereed medical journal, precisely the type of source upon which CHAMPUS purports to rely. The authors of the report developed an HDC treatment regimen including hematologic support through ABMT or PSCR. Bezwoda Report at 2483. The trial compared its regimen with conventional chemotherapy using a comparable drug composition. *Id.* The study concludes that

> the use of high-dose chemotherapy resulted in a substantially increased [complete response] rate, together with a significant but more modest effect on response duration and survival.... High-dose chemotherapy appears to be a suitable treatment

approach for selected younger patients with breast cancer.

Bezwoda Report at 2489.

The Bezwoda Report was published in October of 1995, two months before Bishop requested CHAMPUS benefits. Notably, neither CHAMPUS nor Dr. Bogner reference or acknowledge this study, even though Dr. Bogner claims that the Office of CHAMPUS continuously reviews refereed medical literature. Not only has CHAMPUS ignored substantial evidence that HDC/PSCR is accepted within the medical community, it has denied Bishop medical coverage for HDC/PSCR in contradiction of its claimed internal policy. Thus, CHAMPUS' denial of benefits has no rational connection to the underlying facts.

### C. Technological Assessments

Finally, CHAMPUS relies on three technological assessments in support of its classification of HDC/PSCR as experimental and investigative. Even though the existence of a Phase III report settles the matter, the Court feels compelled to address the assessments. CHAMPUS has cited these reports in virtually every case, and the Court finds that they do not justify CHAMPUS' position.

### 1. DATTA and OHTA Reports

The DATTA and OHTA reports both address ABMT, not PSCR, in the treatment of cancer. However, these assessments do not justify CHAMPUS' denial of coverage for HDC treatments for several reasons. First, the DATTA panelists found that ABMT was an appropriate support treatment for cancer patients. DATTA Report at 4. The panelists further rated the safety and effectiveness of ABMT as established or promising. *Id.* Although panelists rated various bone marrow purging techniques as investigational, this rating applied to ABMT in the treatment of leukemias, not breast cancer.[6] *Id.* In fact, the assessment does not address the treatment of breast cancer at all. Thus, this report cannot suffice to deny coverage for HDC/PSCR or ABMT treatment of breast cancer.

---

**6.** Nevertheless, CHAMPUS provides coverage for HDC/ABMT in the treatment of leukemia.

Next, CHAMPUS presumably relies upon the OHTA Report because it concludes that the role of ABMT in the treatment of breast cancer is "undefined" in the absence of Phase III clinical trials.[7] However, a Phase III clinical trial has now been completed, with positive results. Therefore, the OHTA Report does not support CHAMPUS' decision.

Finally, even in the absence of Phase III trials, other courts have previously held that CHAMPUS' reliance on the DATTA and OHTA reports to deny benefits for HDC/PSCR or ABMT was arbitrary and capricious, finding the reports outdated. *Wilson v. CHAMPUS* 65 F.3d 361 (4th Cir.1995); *Smith v. CHAMPUS,* 884 F.Supp. 303 (E.D.Va.1994).

### 2. ECRI Report

The ECRI report is a technological assessment of previously conducted HDC/PSCR or ABMT studies. The ECRI report compared the efficacy of HDC treatments with conventional chemotherapy by analyzing 40 uncontrolled studies of HDC/PSCR or ABMT. ECRI report at 68. However, 45% of these studies were "meeting abstracts" which ECRI found "difficult to evaluate because they do not contain complete data or study descriptions." *Id.* The ECRI report further stated that "[e]valuating the therapeutic effectiveness of HDC with [ABMT or PSCR] for breast cancer is difficult because of variations in regimen, patient selection, and reporting of results." *Id.* To account for these deficiencies, ECRI employed "meta-analysis," defined as a "systematic method for the statistical combining of results from multiple clinical trials to obtain a quantitative estimate of the overall effect of a particular intervention or variable on a defined outcome." ECRI Report at 70. Accordingly, ECRI compiled "data sets" and constructed independent variables in order to compare HDC studies with conventional chemotherapy studies. *Id.* at 74–75. While the Court does not discount its importance and value, the results of the ECRI report cannot take precedence over a controlled clinical trial ac-

tually comparing HDC treatments and conventional chemotherapy.

According to CHAMPUS policy and the affidavit of Dr. Bogner, CHAMPUS places the most emphasis on Phase III refereed medical literature when determining whether a medical treatment is "generally accepted." CHAMPUS cannot reasonably rely on a technological assessment report—statistically supplemented and compiled—to deny coverage for HDC/PSCR in light of a Phase III report evidencing the treatment's efficacy.

The existence of this literature, in addition to the many oncologists and institutions that perform HDC/PSCR or ABMT, shows that HDC/PSCR or ABMT is indeed "generally accepted" within the medical community and therefore covered under CHAMPUS policy. Therefore, the Court finds CHAMPUS' decision to deny benefits for Bishop's HDC/PSCR treatment arbitrary and capricious.

### V. SEALING OF ECRI REPORT

■ During oral argument on the motion for preliminary injunction, counsel for CHAMPUS indicated that CHAMPUS wished to seal the ECRI Report. The ECRI report is copyrighted and distributed to subscribers of the non-profit organization. Apparently, CHAMPUS, ECRI, or both, fear that if the report is included in a public record, persons or institutions could discover the contents of the report without paying for it.

■ There is a "strong presumption" in favor of the public's right to access judicial records. *Valley Broadcasting Co. v. United States Dist. Ct.,* 798 F.2d 1289, 1294 (9th Cir.1986). However, that right is not absolute; a district court has supervisory power over its own records and files, and access has been denied where court files might become vehicles for improper purposes. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978); *see also Valley Broadcasting,* 798 F.2d at 1294 (citing *Nixon* ).

---

**7.** Although the report did not address PSCR, CHAMPUS equates the two treatments. *See* note

1 *supra.*

In determining whether to grant or deny the protective order sought, district courts must balance the parties' and the public's respective interests. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir.), *cert. denied*, 506 U.S. 869, 113 S.Ct. 198, 121 L.Ed.2d 141 (1992); *Valley Broadcasting*, 798 F.2d at 1294.

In this instance, the Court has difficulty discerning CHAMPUS' interest in sealing the ECRI report. ECRI, rather than CHAMPUS, holds the copyright; however, ECRI is not a party in this action. Moreover, the ECRI report is protected by copyright, thus preventing it from being reprinted or disseminated without prior authorization from ECRI.

Furthermore, it is a bit late to seal the ECRI report. CHAMPUS relies heavily on this report in legal disputes over HDC treatments, including the instant case. CHAMPUS is using this report to justify the denial of benefits for breast cancer treatment, and likely will continue to do so. Therefore, CHAMPUS' interest, whatever it is, does not outweigh the public's right to access public records.

## VI. ATTORNEYS FEES

A district court shall award "fees and other expenses" in any action brought by or against the United States or an agency, to the prevailing party other than the United States, "incurred by that party in any civil action ... *including proceedings for judicial review of agency action*, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. §§ 2412(d)(1)(A); (2)(A).

In light of the Phase III report, previous court rulings, and CHAMPUS policy, it appears that CHAMPUS' position is not substantially justified.

## CONCLUSION

Based on the facts and evidence presented in the record, the Court finds CHAMPUS' denial of benefits for Bishop's HDC/PSCR treatment arbitrary and capricious. The record shows that HDC/PSCR or ABMT is generally accepted and therefore covered under CHAMPUS policy. Accordingly,

**IT IS HEREBY ORDERED** that summary judgment is **GRANTED** in favor of plaintiff.

**IT IS FURTHER ORDERED** that plaintiff's claim for permanent injunction and declaratory relief is **GRANTED.** Defendant is enjoined from denying coverage for plaintiff's high-dose chemotherapy with peripheral stem cell rescue treatment for breast cancer.

**IT IS FURTHER ORDERED** that plaintiff **SHALL FILE** a bill of costs, and counsel an affidavit of fees, within ten days of receipt of this Order, for hearing pursuant to LR 54. Defendant may file objections within five days of service of the bill and affidavit. The Court will determine costs and fees without oral argument after receipt of the objections or the deadline for same.

**IT IS SO ORDERED.**